Filed 3/28/25

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| 11640 WOODBRIDGE CONDOMINIUM HOMEOWNERS' ASSOCIATION, | B333848 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV00778) |
| v. | |
| FARMERS INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Reversed.

Shernoff Bidart Echeverria, William M. Shernoff, Travis M. Corby and Cooper Johnson for Plaintiff and Appellant.

Woolls Peer Dollinger & Scher, Galil S. Cooper and H. Douglas Galt for Defendant and Respondent.

————————————————

In 2021, while a building owned by appellant 11640 Woodbridge Condominium Homeowners' Association (HOA) was being reroofed, two rainstorms penetrated the partially constructed roof and caused extensive interior damage. The HOA made a claim under its condominium policy, which was underwritten by respondent Farmers Insurance Exchange (Farmers). Farmers denied the claim, concluding that the HOA's losses resulted from nonaccidental faulty workmanship, which the policy did not cover.

The HOA then brought the present action, alleging breach of contract and breach of the implied covenant of good faith and fair dealing against Farmers. Farmers moved for summary judgment, and the trial court granted the motion, concluding there was no coverage under the condominium policy as a matter of law.

We reverse. As we discuss, the condominium policy was an "all-risks" policy, which covered all damage to the HOA's property unless specifically excluded. There are triable issues of material fact as to whether the exclusions relied on by Farmers—the water damage exclusion and the faulty workmanship exclusion—preclude coverage in the present case. We thus reverse the summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The roof replacement and property damage.

In 2021, the HOA hired Nelson Alcides Bardales, doing business as Local Roofer (Bardales), to replace the roof of the

condominium complex building (the building).[1]  The proposal prepared by Bardales identified the following scope of work:

"Tear off Existing Roof Down to Wood Sheeting

"Inspect and Replace any Dry Rot Wood

"Prepare Surface to Receive New Roof System

"Build New Wood Platforms for A/C Units

"Install One Layer #28 Glass Ply[2]

"Hot Mop[3] 3 Layers #11 Glass Ply

"Install All New Vent and Pipes with 509 Roof Cement

"Hot Mop One Layer of 72 Cap Sheet Over A/C Unit Platforms and Walls

"Install New Sheet Metal Pans Under A/C Units

"Top Mop and Seal with #5 Granite Rock"

Bardales began the job on about September 29, and over the next five days he removed approximately 80 percent of the roof membrane.[4]  Bardales intended to replace those portions of

---

[1]     All subsequent date references are to 2021 unless otherwise stated.

[2]     "Glass Ply" is a roofing layer consisting of a fiberglass membrane coated with waterproofing asphalt. (buildsite.com/pdf/tremcoroofing/BURmastic-Glass-Ply-Product-Data-1827310.pdf.)

[3]     "Hot mopping" is a method of installing a roof that involves laying down a base layer of felt, which is then saturated with hot liquid asphalt.  (<https://cal-energy.com/perks-of-hot-mop-roofs/> [as of March 27, 2025], archived at <https://perma.cc/8JJY-CZVZ>.)

[4]     The reference to the roof membrane appears to originate in Bardales's deposition testimony, but nothing in the summary

the plywood sheets that showed evidence of dry rot, and then to install new layers of the new roof membrane. However, on October 4, after the roof membrane was removed, there was a rainstorm that damaged the exposed insulation and plywood. As a result, water entered about half the condominium units.

Because of the damage caused by the rain, Bardales had to remove and replace about 80 percent of the insulation and plywood. He then added a layer of "base paper" and "base felt," hot-mopped and tarred much of the roof, and covered the entire roof with tarps before the next rain was expected. However, a second heavy rainstorm on about October 25, 2021 blew off some of the tarps and penetrated the exposed felt layer. As a result, water entered all of the condominium units, causing significant damage.

## II. The condominium policy.

The HOA was insured under a Condo/Townhome Premier Policy (policy) written by Farmers for the period October 14, 2020 to October 14, 2021. Under the policy, Farmers agreed to pay for "direct physical loss of or damage to Covered Property" at the HOA's premises "caused by or resulting from any Covered Cause of Loss." The policy defined the relevant terms as follows:

—"*Covered Property*" includes any "[b]uilding and structure described in the Declarations," including "[c]ompleted additions," "[p]ersonal property owned by [the HOA]," and, if not covered by other insurance, "[a]dditions under construction, alterations[,] and repairs to the building or structure." "Covered Property"

---

judgment record or the parties' appellate briefs describes which layers of the roof constitute the "membrane."

4

excludes, among other things, "[p]ersonal property owned by, used by[,] or in the care, custody[,] or control of a unit-owner." (Italics added.)

—"*Covered Causes of Loss*" are "Risks of Direct Physical Loss" unless the loss is "[e]xcluded in Section B" or "[l]imited in Paragraph A.4." (Italics added.)

The policy also contained two coverage exclusions that are relevant to our analysis:

—*Water damage exclusion:* Farmers will not pay for loss or damage caused directly or indirectly by "[w]ater," "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." However, Farmers *will* pay for "[w]ater damage to the interior of any building or structure caused by or resulting from rain, . . . whether driven by wind or not, if . . . [t]he building or structure first sustains damages by a Covered Cause of Loss to its roof or walls through which the rain . . . enters."

—*Faulty workmanship exclusion*: Farmers will not pay for loss or damage "caused by or resulting from" specified exclusions, including, among others, "[f]aulty, inadequate or defective . . . [p]lanning, zoning, development, surveying, siting . . . [and] workmanship, repair, construction [or] renovation." (Italics added.) However, "if an excluded cause of loss . . . results in a Covered Cause of Loss," Farmers "will pay for the loss or damage caused by that Covered Cause of Loss."

## III. The insurance claim.

The HOA made a claim for water damage under the policy on October 6, and again after the October 25 rain. As part of its investigation of the claim, Farmers retained Pete Fowler Construction Services, Inc. (Fowler) to inspect the HOA's roof. Fowler reported that Bardales failed to follow industry standards

5

by removing nearly the entire roof membrane at once, rather than in small sections.  Bardales did not have the capacity to quickly tar the areas where the roof had been removed, and tarps placed over the building did not provide sufficient temporary rain protection.  The building thus was completely exposed during subsequent rainstorms.

Based on Fowler's investigation, Farmers denied the HOA's claim on November 1.  Its denial letter said:

"[O]ur investigation found that roofing company Local Roofer was retained for a roof replacement operation. Local Roofer removed the existing roof down to the roof deck sheathing before a storm approached.  During the storm events, rainwater entered into the building through the partial remaining roof elements not intended or expected to be an effective barrier against a rainstorm.  Rainwater entered the building through openings in the roof intentionally made by Local Roofer during their reroof processes and not as a result of a covered accidental event.  While the roof was tarped, and a section of the tarp blew off the roof, the blowing of a tarp off a roof does not create an opening in the roof.  Instead, the roof sheathing with or without a tarp is not a roof and the opening in the roof was caused by the roofers replacing the roof, not wind. Further, Local Roofer did not meet the standard of care in their roofing processes.  Thus, the removal of roof surfacing in addition to not being accidental, excludes faulty workmanship. Unfortunately, your E3422-3 Condominium Property Coverage Form excludes water in any form, and negligent work.  There is no coverage for the loss sustained."

## IV. The present action.

The HOA filed the present action against Farmers and Bardales in January 2022. The complaint alleged that Bardales removed the entire top layer of the building's roof down to the plywood decking that served as the roof's foundation. Because the roof was not fully protected from the elements, when storms hit the area on October 4 and 25, "the building's roof was damaged[,] ultimately resulting in water intrusion to the walls and its interior." Specifically, "[m]any of the complex's 31 units suffered collapsed ceilings and water-logged walls, forcing the residents to move out. The common areas and great room also suffered extensive damage. The cost of remediation and repair has been estimated at more than $3.5 million."

As against Farmers, the HOA asserted causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.[5] Specifically, the HOA alleged that the water exclusion to the policy did not apply because the HOA's building "sustained damage first to its roof and walls, through which the rain entered." The HOA also alleged that the faulty workmanship exclusion did not apply because California courts have interpreted this provision not to apply to "faulty processes" employed by a contractor, and because the building "first sustained damage to its roof before water entered the building." Therefore, "whether [the HOA's] loss was caused by the storm or by Local Roofer's faulty process, or by both, the loss was covered by the Policy," and Farmers "knowingly and intentionally misconstrued the Policy's exclusions . . . to deny coverage."

---

[5] The HOA also asserted a cause of action against Bardales for professional negligence.

7

## V.     Farmers' motion for summary judgment.

Farmers filed a motion for summary judgment in February 2023, urging that coverage was excluded by both the water damage exclusion and the faulty workmanship exclusion.  First, Farmers noted that the HOA's policy specifically excluded coverage for damage caused by water unless the water damage was caused by "a Covered Cause of Loss" to the insured's roof or walls.  Although the damage in the present case unquestionably was caused by water, Farmers asserted that the water did not enter the building as the result of a covered cause of loss.  Farmers said:  "In the first rain event, the water entered through the sheathing exposed by Bardales' removal of the entire roof at once.  It rained while the roof was off.  In the second rain event, the water entered through gaps between tarps placed as temporary covering over unwaterproofed areas of the incomplete roof.  Covered by a tarp or not, there was no *damage* to the building through which the rain entered.  The rain entered through openings *intentionally* created by Bardales.  In California, insurance is not available for losses that are not fortuitous and accidental."  Further, Farmers urged:  "Plaintiff cannot defeat application of the exclusion by contending that the roof decking or sheathing was a 'roof', since it admits that the sheathing without tarps was not impervious to water penetration.  Nor does it defeat application of the exclusion if Plaintiff contends that the tarps were blown off the unfinished roof by wind (contrary to Bardales' personal percipient observation).  A tarp is not a roof as a matter of California law.  It is merely a temporary covering, or . . . a 'nonstructural band-aid.' "

8

Farmers also contended that the policy did not cover the HOA's water damage under the faulty workmanship exclusion. It urged that Bardales was negligent, and his negligence caused rainwater to penetrate the interior of the building. Specifically, Farmers asserted: "Bardales' work was faulty, inadequate and defective in at least the following ways: by *planning* to remove the entire roof all at once rather than one section at a time; by *workmanship* in removing entire roof all at once yet failing to protect against water penetration in the event of rain knowing the sheathing was not impervious to such penetration by itself; by failing to timely *repair* the wet insulation; by *constructing* the lower layers of the roof without protection of the building from water penetration; and by using *inadequate materials used in repair and construction* in that the tarps used were inadequate to protect the building from water penetration."

In support of its motion for summary judgment, Farmers submitted the declaration of claims adjuster Taylor Von Ahlefeld. He explained: "Section B, Exclusions, section B.1.f (1)(a) and (2)(b)(i), excludes all damage from water, directly or indirectly, except in specified limited circumstances. The policy further states: 'Such loss or damage is excluded . . . regardless of any other cause or event that contributes concurrently or in any sequence to the loss.' For coverage to apply, the water must enter the building through physical damage first caused to the building (usually the roof) by a covered cause of loss. Typically, that covered cause of loss is wind, hail, or a falling tree or object. Here, there was no such covered cause of loss. Based on the facts developed at the time of my investigation, it was clear that the water entered through openings intentionally uncovered or created by a contractor during re-roofing operations.

9

Intentionally created openings are not a covered cause of loss. Even if tarps blew off the roof, the tarps were not a roof, but only temporary coverings of exposed areas. . . .

"In addition, to prevent this first party property policy issued to the property owner from becoming a liability policy that protects negligent third-party contractors—who are not even the company's insureds—from the consequences of their own negligence, under section B.3.c.(2), negligent or faulty workmanship is also and separately excluded. That exclusion states that the Policy 'will not pay for loss or damage caused by or resulting from' . . . 'Faulty, inadequate, or defective . . . 'planning,' 'workmanship,' 'repair,' 'construction,' 'renovation,' 'remodeling,' or . . . 'maintenance.' All those things applied to this situation in my judgment. . . . While the roofer's negligent work did cause damage, that damage did not result from a covered cause of loss under the plain terms of the Woodbridge Policy. . . . [¶] . . . Therefore, I was unable to find coverage for this loss."

The HOA opposed the motion for summary judgment. It asserted that Bardales's negligence—namely, his "flawed process"—was a covered cause of harm and was the efficient proximate cause of the damage. Alternatively, the HOA urged that there was coverage under the water damage exception because the roof was damaged before rainwater entered the building.

The trial court granted the motion for summary judgment, concluding that the policy did not cover the HOA's losses because both the water damage exclusion and the faulty workmanship exclusion applied. The trial court entered judgment on July 13, 2023. The HOA timely appealed.

# DISCUSSION

## I.     Legal principles.

### A.     Standard of review.

Summary judgment is proper if the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to prevail on a cause of action as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A defendant moving for summary judgment has the initial burden to show the plaintiff cannot establish one or more elements of the challenged cause of action or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)  A defendant meets its burden by presenting affirmative evidence that negates an essential element of the plaintiff's claim, or by submitting evidence that demonstrates "the plaintiff does not possess, and cannot reasonably obtain, needed evidence" to prove an essential element of the plaintiff's claim.  (*Aguilar*, at p. 855.)

If the defendant makes a sufficient showing, the burden then shifts to the plaintiff to demonstrate a triable issue of material fact exists.  (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of fact exists if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion.  (*Aguilar, supra*, 25 Cal.4th at p. 850.)

On appeal from a summary judgment, we review the record de novo and independently determine whether triable issues of material fact exist.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)  We "view the evidence in a light favorable"

to the nonmoving party, resolving any evidentiary doubts or ambiguities in that party's favor. (*Saelzler*, at p. 768.)

## B. Principles of insurance interpretation.

The principles governing the interpretation of insurance policies in California are well settled. " 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) "If contractual language is clear and explicit, it governs." (*Bank of the West*, at p. 1264; see Civ. Code, § 1638.) If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " (*Bank of the West*, at p. 1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. (*Bank of the West*, at p. 1264).' (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 501.) The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection. (See *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 552; *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37–38.)" (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).)

To ensure that coverage conforms to the objectively reasonable expectations of the insured, "in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The

insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Minkler*, *supra*, 49 Cal.4th at p. 322.) The court is not required " 'to select one "correct" interpretation from the variety of suggested readings;' " instead, where there are multiple plausible interpretations of a policy, a court must find coverage if there is a " 'reasonable interpretation under which recovery would be permitted.' " (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 655.)

## II. The present policy: all-risks coverage, with exclusions for water damage and faulty workmanship.

### A. Background.

First party property insurance indemnifies property owners against loss to property. (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (2024) 15 Cal.5th 1106, 1122 (*Another Planet*), citing 10A Couch on Insurance (3d ed. 2005) § 148:1.) There are two general categories of first-party property insurance. "Named perils" or "specific perils" policies provide coverage only for the specific risks enumerated in the policy and exclude all other risks. (7 Couch on Insurance, *supra*, § 101:7.) "All-risk" policies provide coverage for all risks unless the specific risk is excluded. (*Ibid.*; *Another Planet*, at p. 1122.)

" 'Historically, property insurance grew out of the insurance against the risk of fire which became available for ships, buildings, and some commercial property at a time when most of the structures in use were made wholly or primarily of wood.' (10A Couch on Insurance, *supra*, § 148:1.) 'On this side of the

13

Atlantic, fire insurance first developed in the middle of the eighteenth century. . . . [T]his was insurance against only one cause of loss, or peril—fire. Over time other insured perils, such as wind and hail, were added. These insured perils were each specified in the insurance policy. For this reason, such insurance came to be known as "specified-risk" coverage. It insured property against the risk of damage or destruction resulting from specified causes of loss.' (Abraham, *Peril & Fortuity in Property & Liability Insurance* (2001) 36 Tort Trial & Ins. Prac. L.J. 777, 782–783, fn. omitted.) By contrast, marine insurance developed 'standardized forms that insured an ocean-going vessel and its cargo against "perils of the high seas." Whereas the development of fire insurance for property on land focused on the danger presented by a specified cause of loss, marine insurance typically provided coverage for all risks associated with a particular shipment or voyage.' (5 New Appleman on Insurance Law Library Edition (2023) § 41.01[1], fn. omitted.) '[B]y the middle of the twentieth century, insurers adopted the marine insurance approach by offering all-risk commercial and homeowners' property insurance. The operative phrase in such policies is contained in the section labeled "Perils Insured Against," and provides coverage against the risk of "direct physical loss" to covered property.' (Abraham, at p. 783, fn. omitted.)

" 'As with any insurance, property insurance coverage is "triggered" by some threshold concept of injury to the insured property. Under narrow coverages like theft, the theft is itself the trigger. Under most coverages, however, the policy specifically ties the insurer's liability to the covered peril having some specific effect on the property. In modern policies, especially of the all-risk type, this trigger is frequently "physical

14

loss or damage" . . . .' (10A Couch on Insurance, *supra*, § 148:46.)" (*Another Planet*, *supra*, 15 Cal.5th at pp. 1122–1123.)

## B.    The condominium policy.

The condominium policy at issue in this case covers "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." "Covered Causes of Loss" are defined as "Risks of Direct Physical Loss unless the loss is Excluded in Section B. . . [¶] or Limited in Paragraph A.4." This language is far from a model of clarity—read literally, the policy says Farmers will pay for "direct physical loss of or damage to" the HOA's property caused by "[r]isks of [d]irect [p]hysical loss." Nonetheless, the language unquestionably gives rise to an "all risks" or "open peril" policy. (See *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 751 & fn. 2 [property policy insuring against " 'risks of direct physical loss to property' " unless excluded or caused by one of several specifically named perils was an " 'open peril' " policy]; *Jordan v. Allstate Ins. Co.* (2004) 116 Cal.App.4th 1206, 1218–1219 ["the Allstate policy is an 'all-risk' policy (i.e., it provides coverage for all risks of loss, *except those expressly excluded*)"].) The policy thus insures the HOA against all physical loss or damage to the HOA's covered property unless specifically excluded.

In support of its motion for summary judgment, Farmers asserted that there was no coverage for the HOA's losses under two policy exclusions: (1) the water damage exclusion, and (2) the faulty workmanship exclusion. We discuss these exclusions below.

15

### III. The water damage exclusion.

As noted above, the policy provides that Farmers will not pay for loss or damage caused directly or indirectly by "[w]ater," "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." However, Farmers *will* pay for "[w]ater damage to the interior of any building or structure caused by or resulting from rain . . . if . . . [t]he building or structure first sustains damages by a Covered Cause of Loss to its roof or walls through which the rain . . . enters."

Farmers contends that the water damage exclusion bars coverage because "[t]he roof at the subject property had been entirely removed," and thus "[t]here was no roof to be damaged when it started to rain." Alternatively, Farmers contends that even if a "roof" remained, water entered through deliberately created openings in the roof, which was not "damage" within the meaning of the policy. The HOA disagrees, urging that "the building did suffer damage that allowed water to enter"— specifically, "the roof was damaged by [Bardales] stripping down the existing roof and exposing it to rain." The HOA urges that this damage to the roof rendered the interior rain damage a covered cause of loss.

As we discuss, there are triable issues of material fact as to coverage under the water damage exclusion. This exclusion therefore cannot support summary judgment for Farmers.

### A. Case law addressing property coverage during roof repairs.

We are aware of just one California case that has addressed all-risk property coverage for losses that occur during roof repairs. In *Diep v. California Fair Plan Assn.* (1993)

15 Cal.App.4th 1205 (*Diep*), a contractor removed a portion of the roof of a warehouse while making roof repairs and covered the opening with plastic sheeting. The plastic sheeting was torn during two rain storms, allowing rain to enter the warehouse and damage the plaintiff's merchandise. (*Id.* at p. 1206.) The plaintiff made a claim under an insurance policy that provided, in relevant part, that the insurer " 'shall not be liable for loss to the interior of the building(s) or the property covered therein caused: [¶] (1) by rain, snow, sand or dust, whether driven by wind or not, unless the building(s) covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct action of wind or hail and then shall be liable for loss to the interior of the building(s) or the property covered therein as may be caused by rain, snow, sand or dust entering the building(s) through openings in the roof or walls made by direct action of wind or hail[.]' " (*Id.* at p. 1208.) The insurer moved for summary judgment, contending there was no coverage because the plastic sheeting did not constitute a "roof." The trial court agreed and granted the motion for summary judgment. (*Id.* at p. 1207.)

The Court of Appeal affirmed. (*Diep*, *supra*, 15 Cal.App.4th at p. 1206.) It noted that the loss would be covered if the plastic sheeting constituted a "roof" because it was undisputed that wind blew the sheeting open, allowing the rain to enter and damage the plaintiff's inventory. However, the court reasoned that while "roof" has many different meanings, it "is commonly considered to be a permanent part of the structure it covers." (*Id.* at p. 1208.) In the case before it, the court found that the plastic sheeting was "a nonstructural band-aid," not a "roof," and thus the policy did not cover the resulting water damage. (*Id.* at pp. 1209, 1211.)

17

Some courts in other jurisdictions have similarly concluded. (See, e.g., *Fourth Street Place, LLC v. Travelers Indem. Co.* (2011) 127 Nev. 957, 966 [270 P.3d 1235, 1241] ["tarps used to cover the areas of the Building's roof exposed by removal of the waterproof membrane did not constitute a 'roof' for purposes of the Policy's rain limitation"]; *Lobell v. Graphic Arts Mut. Ins. Co.* (N.Y. App. Div. 2011) 83 A.D.3d 911, 913 [921 N.Y.S.2d 306, 308] ["Contrary to the plaintiffs' contention, the tarps that had been placed over the openings in the first floor ceiling of their building did not come within the definition of the term 'roof' as used in the 'windstorm or hail' provision of the policy, which provided that damage to personal property caused by rain was not covered unless the rain entered the home as a result of wind or hail causing an opening in a 'roof' "]; *New Hampshire Ins. Co. v. Carter* (Fla. Dist. Ct. App. 1978) 359 So.2d 52, 53 [policy did not cover damage caused by rain that entered through partially constructed roof]; *Camden Fire Ins. Assn. v. New Buena Vista Hotel Co.* (1946) 199 Miss. 585, 593–600 [24 So.2d 848, 848–851] [same].)

Other courts, however, have differently interpreted the water exclusion language of all-risk property policies. In *Dewsnup v. Farmers Ins. Co.* of Or. (2010) 349 Or. 33 [239 P.3d 493] (*Dewsnup*), the plaintiff undertook repairs to his home's roof, which was made up of a plywood sublayer and an outer layer of wood shakes, by removing the outer layer and replacing it temporarily with plastic sheets stapled to the plywood. That night, a storm blew off the plastic sheets, allowing rain to enter the plaintiff's home through the joints between the plywood. (*Id.* at p. 495.) The plaintiff made a claim under his homeowner's insurance policy, but the insurer denied it, concluding that the

property damage was not covered because the plastic tarp was not a "roof" within the meaning of the policy. (*Ibid.*) The trial court granted the insurer's motion for summary judgment, and the Court of Appeal affirmed. (*Id.* at p. 495.)

The Oregon Supreme Court reversed. It explained that "[t]he ordinary meaning of the terms 'roof' and 'roofing' do not expressly require that a roof must be permanent, as defendant argues. To be sure, a 'roof,' which consists, in part, of 'roofing' materials, should be reasonably suitable to 'maintain a cover upon [a building's] walls' in order to serve its function. [Citation.] 'Roofing,' to do the same, must provide some level of 'protection from the weather.' [Citation.] Taken together, those definitions imply requirements of structural integrity and protection from the elements[.]" (*Dewsnup*, *supra*, 239 P.3d at p. 497.) However, the court noted, "those are functional elements, not necessarily durational ones. No roof is permanent. When a roof is sufficiently durable to serve the functional purposes described above, it is still a 'roof' within the ordinary understanding of that term, even if it is not necessarily permanent." (*Ibid.*) In the case before it, the court concluded that a reasonable juror could conclude that plastic sheeting secured to a plywood sublayer was a "roof" because it was "suitable to protect the house for the duration of the repair." (*Id.* at p. 500.) Accordingly, the insurer's motion for summary judgment should have been denied. (*Ibid.*)

The New Jersey Court of Appeal similarly concluded in *Victory Peach Group, Inc. v. Greater New York Mut. Ins. Co.* (App. Div. 1998) 310 N.J. Super. 82 [707 A.2d 1383] (*Victory Peach*). There, the insured attempted to repair his roof by cutting troughs in the roof to improve drainage. Because the repairs were not completed at the end of the day, the insured covered the area

with vinyl tarpaulins nailed to the roof. That night, a rainstorm ripped off the tarpaulins, allowing rain to enter the building and damage its contents. (*Id.* at p. 1384.) The property insurer denied coverage for the damage, and a jury returned a liability judgment for the insured. The insurer appealed. (*Id.* at p. 1383.)

The appellate court affirmed the judgment for the insured. It noted that the applicable insurance policy covered rain damage to a building's interior if "[t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain . . . enters," and also covered "[a]dditions under construction, alterations[,] and repairs to the building or structure." (*Victory Peach*, *supra*, 707 A.2d. at pp. 1384, 1386.) Thus, the court reasoned: "[W]ere the rain to have entered through the old defects in the roof observed by [the insured] and which necessitated the repairs, that would be a 'Covered Cause of Loss.' [Fn. omitted.] Likewise, the entry of the rain through the unfinished repairs would seem to be a 'risk of direct physical loss' and, thus, a 'Covered Cause of Loss.' No exclusions apply. The limitation cannot apply by its own terms, since the roof did sustain damage by a 'Covered Cause of Loss.' " (*Id.* at p. 1386.)

In reaching this conclusion, the court rejected the insurer's assertion that there could be no coverage because the damage was to temporary repairs, not to the roof. The court explained: "First, since the repairs themselves are 'covered property,' the entry of the rain through the damage to those repairs would constitute a 'Covered Cause of Loss' . . . . Second, we simply do not accept the factual proposition that the repairs to the roof made the roof something other than a roof. At the least, the provision is ambiguous." (*Victory Peach*, *supra*, 707 A.2d. at p. 1386.) Moreover, the court said, the burden was on the

insurer, as the drafting party, to bring the case within an exclusion or limitation.  In the case before the court, the insurer "[q]uite simply . . . has not done so."  (*Id.* at p. 1387.)

The court also similarly concluded in *Wellsville Manor LLC v. Great American Ins. Co.* (E.D.N.Y., Oct. 1, 2024, No. 22-CV-1229 (MKB)) 2024 WL 4362599, at *1 (*Wellsville Manor*).  There, the insured retained a contractor to replace the entire roof of a commercial property.  (*Id.* at p. *2.)  During construction, the contractor removed the gravel ballast, which was one of four layers of the roof and the layer responsible for preventing upward movement of the roof membrane due to wind.  (*Ibid.*)  A storm subsequently loosened the roof membrane and allowed water to enter the premises.  (*Ibid.*)  The insurer denied coverage for the water damage, concluding that the damage was not caused by a covered cause of loss, and the insured sued for breach of contract.  (*Id.* at p. *3.)

The insurer moved for summary judgment of the insured's claim, asserting that the premises were not covered by a "roof" because the contractor had removed the roof's top layer and had failed to install a temporary ballast.  (*Wellsville Manor*, *supra*, 2024 WL 4362599, at *7.)  The district court disagreed and denied the insurer's motion for summary judgment.  It explained: "The Court finds that the removal of the permanent ballast is insufficient to establish that there was no roof on the Premises the day of the loss.  First, 'roof' is not defined in the Policy.  Second, it is defined in the dictionary as 'the cover of a building,' [citation], or 'the covering that forms the top of a building,' [citation].  Under these definitions, the three remaining layers of protection, even without the permanent ballast, were sufficient to constitute a covering over the Premises such that there was a

'roof' on the Premises the day of the loss." (*Id.* at p. *8.) Moreover, "even if the Court were to conclude that the term 'roof' is ambiguous and subject to two meanings, the Court is required to construe the term in favor of Plaintiff. [Citations.] The Court therefore finds that the membrane and remaining two layers were sufficient to constitute a 'roof' within the meaning of the roof limitation provision of the Policy." (*Ibid.*; see also *Sloan v. Allstate Ins. Co.* (Mo. Ct. App. 1998) 977 S.W.2d 72 [summary judgment for insurer reversed; although half of roof had been removed, the insured's contention that water damage occurred after wind damaged both the remaining and temporary roof created triable issues of material fact as to coverage]; *Homestead Fire Ins. Co. v. DeWitt* (1952) 206 Okla. 570 [245 P.2d 92] [affirming judgment for insured; where wind blew off canvas covering opening in roof during renovation, resulting interior rain damage was covered by property policy].)

### B.     Analysis.

Consistent with *Dewsnup*, *Victory Peach*, and *Wellsville Manor*, we conclude that there are triable issues of fact as to whether the water exclusion applied in the present case.

As an initial matter, we reject Farmers's contention that the property was without a "roof" when it suffered rain damage in October 2021.[6] The policy does not define "roof," and we agree with the cited cases that a common sense meaning of "roof" includes a covering over a building that provides structural integrity and protection from the elements. We note in this

---

[6]     In so concluding, we reject the contrary analysis of *Diep*, *supra*, 15 Cal.App.4th 1205.

regard that because no roof is permanent, all roofs must be periodically replaced. Replacing a roof requires removing worn outer layers and replacing them with new materials, thus leaving a structure not fully protected from the elements for a least a short time. Yet, nothing in the relevant condominium policy informed an insured that it would be without coverage for rain damage during periodic reroofing. To the contrary, the policy defines "covered property" to include "[a]dditions under construction, alterations and repairs to the building or structure," unless covered by other insurance. In view of this language, we conclude that a roof under repair remains a "roof" within the meaning of the policy.

In the present case, therefore, the property was never without a "roof" because Bardales removed just some of the roof's outer layers, leaving the lower layers intact. Specifically, at the time of the first rainstorm, Bardales had removed much of the roof's top layers, but other layers, including the plywood sheathing and insulation, remained. By the time of the second rainstorm, Bardales had replaced about 80 percent of the insulation and plywood, added a layer of "base paper" and "base felt," hot-mopped and tarred much of the roof, and covered the entire roof with tarps. Like the courts in *Dewsnup*, *Victory Peach*, and *Wellsville Manor*, we conclude that the remaining layers of roof, even without the roof membrane, were sufficient to constitute a "roof" within the meaning of the policy.

Having concluded that the property had a "roof" at all points during the repairs, we must consider whether rain entered the property through "damage" to the roof caused by a "Covered Cause of Loss." Farmers asserts that the policy covers only losses caused by "perils"—i.e., by " 'fortuitous . . . forces . . . which bring

23

about the loss.' " It thus urges there is no coverage here because rainwater entered the property through openings in the roof deliberately created by Bardales, not as the result of fortuitous weather damage. But the words "perils" and "fortuities" do not appear anywhere in the policy. Instead, the policy defines "Covered Cause of Loss" to mean *any cause of physical damage* to the property not otherwise excluded, and nowhere in the policy's several pages of exclusions is there an exclusion for losses that result from deliberate conduct.

Moreover, the policy does not purport to exclude losses that result from workmanship generally, but only from such "workmanship, repair [or] construction" that is "faulty, inadequate or defective." Under the maxim *expressio unius est exclusio alterius*, "[t]he fact that [a] contract expressly so provides tends to negate any inference that the parties also intended another consequence to flow from the same event." (*Stephenson v. Drever* (1997) 16 Cal.4th 1167, 1175; *G & W Warren's, Inc. v. Dabney* (2017) 11 Cal.App.5th 565, 576.) Accordingly, the exclusion for damages caused by negligent workmanship suggests that the policy does *not* exclude damages caused by workmanship that was not negligent.

We therefore conclude that rain damage resulting from roof repairs are covered unless expressly excluded by another provision of the policy, such as the faulty workmanship exclusion. We turn now to that question.

## IV. The faulty workmanship exclusion.

The policy's faulty workmanship exclusion says that Farmers will not pay for loss or damage "caused by or resulting from" specified exclusions, including from "negligent work," defined as "[f]aulty, inadequate or defective . . . workmanship,

24

repair, construction, renovation [or] remodeling" and "[p]lanning, zoning, development surveying, siting." Farmers urges this exclusion applies because it is undisputed that all of the HOA's losses were "caused by or result[ed] from" faulty workmanship— namely, by Bardales's decision to remove the entire roof before replacing any part of it.[7]

The HOA urges that the term "faulty workmanship" is ambiguous because it "is reasonably susceptible to at least two different interpretations: (1) the flawed quality of a finished *product* or (2) a flawed *process*." The HOA suggests that in the present case, only Bardales's *process* was faulty because the roof repairs were uncompleted at the time of the rain damage. The HOA thus contends that the faulty workmanship exception should not apply because it is reasonable to interpret "faulty workmanship" to apply only to a flawed *product*. Alternatively, the HOA urges that even if "faulty workmanship" applies to both faulty products and processes, Farmers was not entitled to summary judgment because it did not establish that Bardales's alleged faulty workmanship was the sole cause of the HOA's losses.

To support its proposed distinction between a faulty "product" and a faulty "process," the HOA relies on the Ninth Circuit's analysis in *Allstate Ins. Co. v. Smith* (9th Cir. 1991)

---

[7] The parties disagree about the proper characterization of Bardales's alleged negligence: The HOA asserts Bardales's alleged negligence was "faulty workmanship," while Farmers characterizes it as defecting "planning." We need not decide whether the alleged negligence constitutes faulty "workmanship" or faulty "planning" because both are excluded under the policy if they are direct causes of loss.

929 F.2d 447 (*Allstate*). There, the insured bought an all-risk policy covering his business property for " 'loss or damage resulting from direct physical loss,' " with exceptions for, among other things, faulty workmanship. The insured suffered a property loss as the result of a rainstorm that occurred after a contractor had removed most of the roof of the insured's building to make repairs. The insured filed an insurance claim, and the insurer sought a declaratory judgment that the insured's losses were not covered because they were caused by faulty workmanship. The district court agreed and entered judgment for the insurer. The insured appealed. (*Id.* at pp. 448–449.)

The Ninth Circuit reversed, concluding that "faulty workmanship" was ambiguous because it could mean either a flawed product (a negligently constructed roof) or a flawed process (failing to properly cover the exposed roof during construction). (*Allstate*, *supra*, 929 F.2d at p. 449.) The court therefore interpreted "faulty workmanship" in the manner most favorable to the insured and concluded that the exclusion did not apply because the insured's losses "were not caused by a flawed product, but by failure to protect the premises during the roof repair process." (*Id.* at p. 450.)

We are unpersuaded by *Allstate*'s analysis, as we conclude, in line with other cases that have declined to follow *Allstate*, that "workmanship" unambiguously refers both to the way a contractor creates a finished product and the finished product itself. (See, e.g., *Fourth Street Place, LLC v. Travelers Indem. Co.*, *supra*, 270 P.3d at p. 1242 ["the plain and ordinary meaning of the term 'workmanship' encompasses the quality of the process utilized to achieve the finished product *and* the quality of the finished product itself" (italics added)]; *Wider v. Heritage*

26

*Maintenance, Inc.* (2007) 14 Misc.3d 963, 975 [827 N.Y.S.2d 837] ["An ordinary business-person applying for a commercial property insurance policy and reading the language of this exclusion would understand that, depending on the type of work done, the faulty workmanship exclusion could apply to the process of doing the work or the finished product"]; *Schultz v. Erie Ins. Group* (Ind.Ct.App. 2001) 754 N.E.2d 971, 976 ["while the term 'faulty workmanship' allows at least two definitions, we see no reason why it must mean *either* a 'flawed product' *or* a 'flawed process.'" Since 'workmanship' denotes both 'process' and 'product,' an insurer could just as likely have both perils in mind when it drafts a policy's list of exclusions"].)

However, although we do not adopt *Allstate*'s reasoning, we nonetheless conclude that the faulty workmanship exclusion does not unambiguously exclude coverage in this case. To establish the absence of coverage, Farmers had to demonstrate that there were no triable issues regarding the cause of the damage to the HOA's property—or stated, differently, that the undisputed evidence established that the damage to the HOA's property was "caused by or result[ed]" from Bardales's negligence. But there was evidence that roof damage was caused not only by Bardales's alleged negligence, but also by wind and rain. Specifically, Bardales testified that rain damaged the exposed plywood and insulation layers on October 4, and wind blew off tarps Bardales placed over the partially constructed roof on October 25. Farmers did not establish that the damage to the plywood, insulation, and tarps—that is, to the "roof"—did not contribute, at least in part, to the interior water damage.

Moreover, as the HOA notes, Farmers introduced no evidence that the roof repairs could have been done in a way that

would have fully protected the property in the event of a rainstorm.  That is, while Farmers's evidence suggested that Bardales failed to follow industry standards by removing nearly the entire roof membrane at once, it did *not* establish that compliance with industry standards would have avoided rain damage entirely—and thus that the damage resulted entirely from Bardales's alleged negligence.

Farmers suggests that the HOA has admitted that Bardales's negligence caused all of its damages, but the portions of the record Farmers cites do not bear out that assertion. Specifically, Farmers notes that when asked in an interrogatory to describe "the location and nature of all physical damage first sustained to the building roof and walls through which the rain entered," the HOA responded that "[t]he physical damage first sustained to the building and walls through which the rain entered the building was from the methods and construction, and flawed process undertaken by [Bardales] in removing the entire top layer of the building's roof down to the roof decking instead of removing it part by part."  But nothing in that response suggests that Bardales's alleged negligence was the *sole* cause of roof damage; to the contrary, the response identifies *both* "construction" *and* a "flawed process undertaken by [Bardales]" as causes of damage.  Moreover, in the next sentence of the interrogatory response, the HOA identified a third cause of damage—namely, that "[w]ind also blew off the temporary roof coverings put in place by [Bardales]."

Farmers also suggests that the HOA's complaint alleged that Bardales's alleged negligence was the sole cause of loss. Specifically, Farmers quotes the HOA's allegation that the roof was not fully protected by the elements "[b]ecause the processes

28

employed by [Bardales] were faulty" and its "processes for protecting the roof were not sufficient." Unquestionably, the HOA alleged that Bardales was negligent, but these allegations do not, as Farmers suggests, constitute a judicial admission that his negligence was the sole cause of damage. To the contrary, the HOA also alleged that roof decking "[g]enerally . . . can provide adequate protection against wind and rain," "the building's roof was damaged" by "storms," and "the water damage was not excluded since the building first sustained damage to its roof before water entered the building." In short, the complaint alleged that Bardales's negligence was *a* cause, but not the *sole* cause, of the HOA's losses.

For the foregoing reasons, therefore, Farmers did not establish that but for Bardales's alleged negligence, no rain would have entered the HOA's property. It thus did not demonstrate that it was entitled to summary judgment under the faulty workmanship exclusion.[8]

## V. Farmers is not entitled to summary adjudication of the HOA's bad faith cause of action.

Farmers contends that even if this court were to reverse the grant of summary adjudication on the HOA's breach of contract claim, we nonetheless should affirm summary adjudication of the HOA's bad faith claim. Specifically, Farmers urges that, even if it misconstrued the policy language, its denial of the HOA's claim was based on an objectively reasonable

---

[8]     Having so concluded, we need not consider whether the rain damage was a covered "resulting" or "ensuing" loss within the meaning of section B.3 of the policy.

interpretation, and thus it cannot be charged with insurance bad faith.

We disagree. "An insurer is said to act in 'bad faith' when it not only breaches its policy contract but also breaches its implied covenant to deal fairly and in good faith with its insured. 'A covenant of good faith and fair dealing is implied in every insurance contract. [Citations.] The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' " (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1071–1072, italics omitted.)

As discussed above, "in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection." (*Minkler*, *supra*, 49 Cal.4th at p. 322; see also *MacKinnon v. Truck Ins. Exchange, supra*, 31 Cal.4th at p. 655 [where there are multiple plausible interpretations of a policy, a court must find coverage if there is a "reasonable interpretation under which recovery would be permitted"].) Here, there is a reasonable interpretation under which recovery would be permitted, and thus Farmers is not entitled to summary adjudication of its bad faith claim.

We reach a similar conclusion with regard to punitive damages. An insurer may be liable for punitive damages if the insured can prove not only that the insurer denied or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing so, was guilty of malice, oppression or fraud.

30

(*Jordan, supra*, 148 Cal.App.4th at p. 1080, citing *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 305.) Farmers has not demonstrated by undisputed evidence that this standard was unmet in the present case. Accordingly, it is not entitled to summary adjudication of its punitive damages claim.

## DISPOSITION

The judgment is reversed. Appellant 11640 Woodbridge Homeowners' Association is awarded its appellate costs.

**CERTIFIED FOR PUBLICATION IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

HANASONO, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.